

INTERACTIVE BROKERS LLC,

      Plaintiff,

v.                                 Civil Action No. 3:17cv127

ROHIT SAROOP, PREYA SAROOP,
and GEORGE SOFIS,

      Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the PETITION (ECF No. 1) filed by Plaintiff Interactive Brokers, LLC ("Interactive") and the DEFENDANTS' CROSS-MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 18) filed by Defendants George Sofis and Rohit and Preya Saroop. For the reasons set forth below, both motions will be DENIED, and this matter will be remanded to the arbitration panel for clarification. To the extent that the Defendants' Cross-Motion and subsequent memoranda can also be construed as a motion for sanctions, that motion will be DENIED.

## BACKGROUND

Although styled as a "petition," this matter comes before the Court as a motion to vacate the arbitration award that was rendered against Interactive Brokers, LLC ("Interactive") by a Financial Industry Regulatory Authority (FINRA) arbitration panel on January 5, 2017. (ECF No. 1, Ex. 1). The Award (ECF

No. 1-2) was rendered in favor of Claimants George Sofis and Rohit and Preya Saroop (hereinafter, "Claimants"), and included awards of both "compensatory damages" and "attorneys' fees pursuant to the parties' agreement." Interactive seeks to vacate the arbitrators' decision, while the Claimants have filed a motion to confirm it. Faced with an inscrutable award, the Court can do neither in good faith, and instead will remand the matter to the arbitrators for clarification.

## A.    Factual Background

Interactive is an online brokerage firm that provides a web-based platform for sophisticated investors to purchase and sell securities and other products on various exchanges throughout the world. (Pet. 6). Interactive offers these services to its customers without any accompanying financial advice.   It merely executes the trades that its customers (or its customers' own investment advisors) request.   Id. Consequently, Interactive's contracts with its customers include, among other things,[1] waivers of liability for any and all losses sustained through the market. (ECF No. 1-2, Ex. B, C). The Claimants in this case were three such customers.

---

[1] Of particular relevance to these proceedings, the contracts also included: (1) a mandatory arbitration provision; (2) a choice of law provision stating that Connecticut law governs contract interpretation; (3) and an attorneys' fee provision that purports to give Interactive (only) the right to fees.

The Saroops opened an account with Interactive on June 18, 2012 with an initial deposit of $25,000. They deposited an additional $75,000 in 2013, and another $50,000 in 2014. Sofis opened his account with Interactive on October 15, 2012 with a deposit of $100,000. Both the Saroops and Sofis hired an independent financial advisor, Vikas Brar of Brar Capital LLC, to run their accounts with Interactive and to make trades on their behalf. The parties appear to agree that neither Brar nor his company has ever been employed by or affiliated with Interactive, and that the decision to hire Brar was made solely by the Claimants themselves.

Over the course of their contractual relationship with Interactive, the Claimants (through Brar) engaged in a high risk trading strategy that relied on the sale of so called "naked short call" options[2] and "margin" trading.[3] These strategies

---

[2] A call option is the option to buy some underlying security (such as the Exchange Traded Notes ("ETNs") at issue in this case) at a predetermined "strike price" up until some future date. If the value of the underlying security never hits the "strike price," the option is worthless and the seller pockets the premium from the sale of the option. Because this is a risky strategy, investors often hedge their position by buying the underlying security involved in the transaction, thereby limiting their risk (and reward). When an investor sells such an option without owning the underlying security (thereby exposing him or herself to higher risk), it is called a "naked" short call.

[3] Essentially, trading on the "margin" refers to a method of buying securities (or stock, etc.) that involves borrowing a part of the sum needed to execute the transaction from the

initially resulted in large profits for the Claimants, but that changed in 2015.

On January 15, 2015, at Brar's request, the Saroops converted their account with Interactive from a Regulation T[4] margin account to a portfolio margin account. Sofis did the same in July of 2015. This change in account type allowed Brar to engage in still riskier transactions on behalf of the Claimants: under Regulation T's margin requirements, investors may borrow up to fifty percent of the purchase price of a security using a loan from the broker; under Portfolio Margin, investors can (usually) achieve far greater leverage.[5]

By the time the Claimants' accounts were converted to portfolio margin accounts in 2015, Brar was exclusively (or nearly exclusively) relying on a strategy of selling naked call options of iPath S&P 500 VIX Short-Term Futures (VXX), an exchange traded note ("ETN") designed to give investors exposure to the so called "fear index." In doing so, Brar was essentially

---

broker himself—here, Brar. Margin trading may result in quicker profits, but it also exposes the investor to the risk of losses in excess of the amount of their initial investment.

[4] 12 C.F.R. § 220.

[5] Unlike Regulation T's initial margin requirement of 50% (2-1 leverage limit on equity), Portfolio Margin uses a sophisticated algorithm to calculate margin requirements based on the overall hypothetical risk of the portfolio (which, in turn, factors in the historical volatility of the underlying securities involved).

betting (on behalf of the Claimants) that the market would remain stable. Brar continued to rely upon and execute these trades after the Claimants converted their accounts to portfolio margin.

The parties dispute whether, and to what extent, FINRA Regulations (specifically, Rule 4210 and regulatory notice 08-09) permitted such trades to be executed using the portfolio margin. It is undisputed, however, that such trades were executed using the portfolio margin, and that they resulted in profits for the Claimants until late August of 2015.[6] Indeed, by the close of markets on August 19, 2015, Sofis' account had a net asset value ("NAV") of $500,529.48 and the Saroops had a NAV of $520,450.40.

On Thursday, August 20, 2017 Brar continued this same strategy, selling hundreds of naked VXX call options. Over the next several days, however, the market experienced a spike in volatility, culminating on August 24, 2015, when the Dow experienced the largest one day decline in its history. The parties dispute the cause of this volatility and decline: while Interactive attributes the loss to the market generally, the Claimants argue (as they did before the arbitrators) that the

---

[6] It is clear from the Arbitrator's Report that the arbitrators concluded that the VXX options were not eligible to be traded using portfolio margin.

losses occurred, at least in part, because of the unreasonable "auto-liquidation" procedures deployed by Interactive.

Notwithstanding this factual dispute, both sides agree that by the time the market opened on August 24, the value of the Claimants' accounts had decreased by 80 percent. This precipitous drop caused the Claimants' accounts to fall into so-called "margin deficiency"–the equity remaining in the accounts had fallen below the minimum maintenance requirements. This margin deficiency, in turn, triggered Interactive's "auto-liquidation" procedures, which, in a period of about thirty minutes, wiped out the remaining balance in the Claimants' accounts (and left them with a still-large margin deficiency). The Claimants responded by bringing an arbitration claim against Interactive.

## B. The Arbitration Decision

In December of 2015, the Claimants filed an arbitration claim with FINRA, as required by their contracts with Interactive. Their Statement of Claim ("SC") (ECF No. 1-10) asserted multiple claims, including: breach of contract, promissory estoppel, violation of state securities statutes, commercially unreasonable disposition of collateral, negligent and intentional misrepresentation, unjust enrichment, and vicarious liability. (SC ¶¶ 46-61). Interactive filed an

answer and counterclaim in response, seeking an award equal to the amount of the Claimants' debt remaining after their accounts had been liquidated. (ECF No. 1-11). Both sides also sought attorneys' fees, and signed FINRA Uniform Submission Agreements, in which they agreed to submit the matters pled in the Statement of Claim for resolution by a FINRA arbitration panel. Although they had a right to do so under FINRA rules, neither side requested a reasoned award from the arbitrators.

An arbitration hearing was held from December 5, 2016 to December 9, 2016. Both sides presented fact and opinion testimony, including experts. Ultimately, on January 10, 2017, the panel rendered a monetary award in favor of the Claimants, including an award of attorneys' fees and a denial of Interactive's counter-claim. (ECF No. 1-2). The arbitrators summarized the case as follows:

> Claimants asserted the following causes of action: breach of contract and promissory estoppel, violation of state securities statutes, commercially unreasonable disposition of collateral, vicarious liability, and common law fraud. The causes of action relate to unspecified securities.

> Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

> In its Counterclaim, Respondent asserted the following causes of action: failure to mitigate and pay a debt.

Id. The panel also noted that the Claimants withdrew their claim

for allowing a non-registered broker to make trades at the close

of the arbitration hearing. Id.

Because neither side requested a reasoned award, the

arbitrators provided little explanation for their decision. The

"Arbitrator's Report" consists of just three sentences, followed

by details of the moneys owed. In their entirety, the

"ARBITRATOR'S REPORT" and "AWARD" state:

### ARBITRATOR'S REPORT

The Claimants are awarded the value of their accounts
on August 19, 2015 ($520,450.40 to the Saroops and
$500,529.48 to Sofis). Respondent's Counterclaim was
dismissed based on Respondent's violation of FINRA
Rule 4210 as further explained in regulatory notice
08-09. The securities placed in the portfolio margin
account were not eligible for that account based on
these rules and regulations.

### AWARD

After considering the pleadings, the testimony and
evidence presented at the hearing, and the post-
hearing submissions, the Panel has decided in full and
final resolution of the issues submitted for
determination as follows:

1. Respondent is liable for and shall pay to Claimants
Rohit and Preya Saroop compensatory damages in the
amount of $520,450.40 plus interest at the rate of 8%
per annum from 30 days of the date of the award until
payment.

2. Respondent is liable for and shall pay to Claimants
Rohit and Preya Saroop attorneys' fees representing
40% of the compensatory damages and 30% of the net
claimed by Respondent for a total of $274,006.16. The
Panel granted attorneys' fees pursuant to the parties'
agreement.

3. Respondent is liable for and shall pay to Claimant George Sofis compensatory damages in the amount of $500,529.48 plus interest at the rate of 8% per annum from 30 days of the date of the award until payment.

4. Respondent is liable for and shall pay to Claimant George Sofis attorneys' fees representing 40% of the compensatory damages and 30% of the net claimed by Respondent for a total of $249,858.49. The Panel granted attorneys' fees pursuant to the parties' agreement.

5. Claimants' claim for witness fees is denied.

6. Respondent is liable for and shall pay to Claimants $600.00 as reimbursement of the non-refundable portion of the filing fee previously paid.

7. Respondent's Counterclaims are denied in their entirety.

8. Respondent's request for attorneys' fees is denied.

9. Any and all claims for relief not specifically addressed herein, including punitive damages, are denied.

Id. Interactive now moves to vacate the award, while the Claimants have filed a cross-motion to confirm it.

## C. Procedural Posture

Interactive filed its "Petition" (ECF No. 1) on February 2, 2017. Recognizing the Petition as a mislabeled motion to vacate, the Claimants responded by filing DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFF'S PETITION TO VACATE THE ARBITRATION AWARD (ECF No. 17) and DEFENDANTS' CROSS-MOTION

TO CONFIRM ARBITRATION AWARD (ECF No. 18).[7] Then, rather than filing a reply brief, Interactive responded by filing PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 30). The accompanying brief ("Pl. SJ Mem."), in turn, included both arguments supporting the summary judgment motion as well as arguments in reply to the Defendants' response (to the original Petition). (ECF No. 31).

The Claimants responded by filing two additional documents: DEFENDANTS' MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO CONFIRM THE ARBITRATION AWARD (ECF No. 37) and DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 38). Finally, Interactive Brokers filed PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (ECF No. 41).

On June 29, 2017, the Court denied Interactive's motion for summary judgment as procedurally improper and scheduled oral argument on the Petition and Cross-Motion to Confirm (ECF Nos. 42-43).[8] Argument on the motions was held on July 26, 2017, and

---

[7] The Claimants' response to the Petition also included a request for sanctions, which will be denied.

[8] The Court's order also informed the parties that the materials filed in support and in opposition to the motion for summary judgment would be considered as part of the record for deciding the Petition (ECF No. 1) and the DEFENDANTS' CROSS-MOTION TO CONFIRM ARBITRATION AWARD (ECF No. 17). See ECF No. 43.

both motions were fully submitted to the Court. The matter is now ripe.

## LEGAL STANDARD

Section 10 of the Federal Arbitration Act sets out the specific, limited grounds upon which an arbitral award may be vacated. They include:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). The Supreme Court has issued further instructions interpreting the fourth of these circumstances: where arbitrators exceed their powers.

In Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064 2013), the Supreme Court explained that "a party seeking relief under § 10(a)(4) bears a heavy burden." Id. at 2068. The Court instructed further:

> It is not enough . . . to show that the arbitrator committed an error—or even a serious error. Because

the parties bargained for the arbitrator's
construction of their agreement, an arbitral decision
even arguably construing or applying the contract"
must stand, regardless of a court's view of its
(de)merits. Only if the arbitrator acts outside the
scope of his contractually delegated authority—issuing
an award that simply reflects his own notions of
[economic] justice rather than drawing its essence
from the contract—may a court overturn his
determination. So the sole question for us is whether
the arbitrator (even arguably) interpreted the
parties' contract, not whether he got its meaning
right or wrong.

Id. at 2068 (internal citations and quotations omitted).

The Fourth Circuit has explained how to proceed when an

award "fails to draw its essence from the contract," and where

the award demonstrates a "manifest disregard of the law." Choice

Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC, 519 F.3d 200, 207

(4th Cir. 2008). An award fails to draw its essence from the

contract "when an arbitrator has disregarded or modified

unambiguous contract provisions or based an award upon his own

personal notions of right and wrong." Three S Delaware, Inc. v.

DataQuick Info. Sys., Inc., 492 F.3d 520, 528 (4th Cir. 2007).

The latter—manifest disregard for the law—requires the moving

party to show that the arbitrator was "aware of the law,

understood it correctly, found it applicable to the case before

[him], and yet chose to ignore it in propounding [his]

decision." Long John Silver's Restaurants, Inc. v. Cole, 514

F.3d 345, 349 (4th Cir. 2008). This latter standard is "not an

invitation to review the merits of the underlying arbitration,"

and will apply only where: "(1) the disputed legal principle is clearly defined and is not subject to reasonable debate; and (2) the arbitrator refused to apply that legal principle." Jones v. Dancel, 792 F.3d 395, 402-03 (4th Cir.), cert. denied, 136 S. Ct. 591, 193 L. Ed. 2d 470 (2015).

Notwithstanding the ground upon which vacatur is requested, the Fourth Circuit has repeatedly emphasized that "judicial review of an arbitration award in federal court is severely circumscribed." Id. at 401 (quoting Apex Plumbing Supply, Inc. v. U.S. Supply Co., 142 F.3d 188, 193 (4th Cir.1998)). Indeed, the Fourth Circuit has described such review as "among the narrowest known at law," Apex, 142 F.3d at 193, and insisted that "a court sits to determine only whether the arbitrator did his job—not whether he did it well, correctly, or reasonably, but simply whether he did it." Wachovia Sec., LLC v. Brand, 671 F.3d 472, 478 (4th Cir. 2012) (internal citations omitted). Thus, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Choice Hotels, 519 F.3d at 207 (quoting U.S. Postal Serv. v. Am. Postal Workers Union, AFL-CIO, 204 F.3d 523, 527 (4th Cir. 2000).

Nevertheless, even that determination—whether an arbitrator actually did his job—is made difficult by the fact that

"[a]rbitrators have no obligation to give their reasons for an award." United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 598 (1960). And, although courts are permitted to remand an award back to the original arbitration panel for clarification of an ambiguity, that power too is significantly limited by precedent. The Supreme Court has instructed:

> A mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement.

Id. The Fourth Circuit, in turn, has echoed this sentiment as "necessary to preserve the benefits of arbitration." Apex Plumbing, 142 F.3d at 193, n. 5.

Notwithstanding this instruction, a genuinely ambiguous, reasoned arbitration award can be remanded for clarification. Specifically, "[w]hen an arbitrator does provide reasons for a decision and when those reasons are so ambiguous as to make it impossible for a reviewing court to decide whether an award draws its essence from the agreement, the court may remand the case to the arbitrator for clarification." Cannelton Indus., Inc. v. Dist. 17, United Mine Workers of Am., 951 F.2d 591, 594 (4th Cir. 1991). At the same time, because "arbitrators need not

14

state reasons for reaching a particular result," the fact that an arbitration award is unreasoned, without more, cannot serve as basis for remand. Remmey v. PaineWebber, Inc., 32 F.3d 143, 150 (4th Cir. 1994). Moreover, courts "must approach remand to the arbitrator with care lest the arbitrator believe that a 'remand' is equivalent to 'retrial' with an expectation of an opposite result the second time around." Raymond James Fin. Servs., Inc. v. Bishop, 596 F.3d 183, 191 (4th Cir. 2010) (internal citation omitted); but see also id. ("[R]emand to an arbitrator for clarification and interpretation is not unusual in judicial enforcement proceedings." Id. (citing McClatchy Newspapers v. Central Valley Typographical Union No. 46, 686 F.2d 731, 734 n. 1 (9th Cir. 1982)).

Although the standards governing remand may be unclear, one thing is obvious from the case law: without an explanation for an award—particularly in complex cases such as this one—the notion of meaningful judicial review becomes tenuous at best. Put simply, "when the arbitrators do not give their reasons, it is nearly impossible for the court to determine whether they acted in disregard of the law." O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc., 857 F.2d 742, 747 (11th Cir. 1988); see also Oxford Health Plans, 133 S. Ct. at 2068. That is the case here.

**DISCUSSION**

The award before the Court is not a reasoned one in the usual meaning of that term. Although the arbitrators did provide some reasons, relating to the denial of Interactive's counterclaim, the actual award of compensatory damages is not explained.[9] Under such circumstances, the Court can only speculate as to whether the arbitrators followed the law. And, because the arbitrators were at least "arguably construing or applying the contract and acting within the scope of [their] authority," the Court cannot vacate their decision. Choice Hotels, 519 F.3d at 207. Nevertheless, even after giving the arbitrators every benefit of the doubt possible, the Court cannot concoct a scenario where the amount of compensatory damages awarded in this case make sense. And, because of the perplexing amount of damages awarded, the Court is also unable to determine which of the nine claims filed by Claimants was the source of liability. In such circumstances, without further explanation from the arbitrators, it is impossible to know whether the arbitrators manifestly disregarded the law or simply made a mistake. O.R. Sec., Inc. v. Prof'l Planning Assocs., Inc., 857 F.2d 742, 747 (11th Cir. 1988). The Court will

---

[9] Interactive urges that "it is obvious from the language and structure of the Arbitrator's Report, that their Award in the Speculators' favor was based solely on FINRA Rule 4210," (Pl. SJ. Mem. 15), but there is nothing obvious at all about the Award.

therefore remand this award to the arbitrators for clarification.

Where the arbitrators do not give an explanation for their award, meaningful judicial review is "all but impossible." Dawahare v. Spencer, 210 F.3d 666, 669 (6th Cir. 2000). Here, the Claimants presented nine claims. The arbitrators specifically explained that "[a]ny and all claims for relief not specifically addressed herein, including punitive damages, are denied." AWARD, ¶ 9. But, one cannot discern from the Arbitrators Report or the Award which claims for relief were, as the arbitrator put it, "specifically addressed." Moreover, it is impossible to determine how the damages awarded are related to any claim that was before the arbitrators. And, the Court cannot simply rubber stamp a damages award that it cannot explain. And, although the Court can hypothesize how Interactive was found liable in this case, the amount of damages awarded—the value of the Claimants' accounts on August 19, 2015—remains baffling.

The amount of damages awarded by the arbitrators does not correspond to any theory of liability that the Court can apprehend, much less the two principal theories of liability articulated by the Claimants at the arbitration. For example, if the predicate for liability was the fact that Interactive allowed ineligible securities to be traded on portfolio margin,

17

then it would seem that a proper compensatory damages award would account for the fact that the Claimants had been executing these trades (and with great financial success) for months prior to the market volatility in August of 2015. It would not simply be pinned to the moment in time when these ineligible trades stopped paying off. Similarly, if Interactive's auto-liquidation procedure was the predicate for liability, an explanation is needed as to why the damages award should equal the value of the Claimant's accounts days before that auto-liquidation began. Indeed, the Claimants themselves admitted to the arbitrators that "[p]rior to any of IB's liquidation trades, the combined value of Claimants' accounts was $172,940.94." (ECF No. 38-2 at 9). Thus, neither theory of liability advanced by the Claimants seems to explain the award given by the arbitrators.

Of course, it is possible the arbitrators had a valid reason for pinning the damages award to the value of the Claimants' account on August 19, 2015. It is also possible the arbitrators simply made a mistake in applying the legal principles governing damages. Or, perhaps the panel manifestly disregarded the law of damages because it was easier than calculating the proper figure, or because they wished to punish Interactive. Two of those scenarios would require the award to be affirmed. Choice Hotels, 519 F.3d at 207. The third would require vacatur. Three S Delaware, 492 F.3d at 528. But, in the

words of the Claimants themselves, "it is simply impossible to discern . . . what legal theories or causes of action the Panel considered and accepted or rejected when finding liability." (ECF No. 37 at 3). The Court agrees.

To a lesser degree, the award for attorney's fees suffers from the same infirmity. The reason given for the award of attorney's fees is "pursuant to the parties agreement." The only agreement that allows an attorney's fee award permits an award to Interactive. The Court can determine, however, that the agreement calls for application of Connecticut law and Connecticut law requires that any contract that permits an award of attorney's fees be reciprocal. So the Court can conclude that there is a legal basis for the award. But, neither the agreement nor Connecticut law provide for percentage awards. Rather, the award must be reasonable. There is nothing in the record to which a percentage fee award can be tethered, much less the percentages that appear in the award. Hence, meaningful review on that issue is not possible.

"Judges . . . are not wallflowers or potted plants." Tagatz v. Marquette Univ., 861 F.2d 1040, 1045 (7th Cir. 1988). And this Court will not act as a rubber stamp. Because the Court cannot even theorize how calculating damages in the way done by the arbitrators would be proper, the Court will remand this arbitral decision back to the arbitrators for clarification as

19

to the predicate for liability and the value of the damages awarded. Although the arbitrators need not give a full opinion, a brief explanation for the basis of the amount of damages awarded is necessary before any semblance of judicial review can be accomplished. The same is true as to the attorney's fee awards. The Court will defer ruling on the other aspects of the award until that explanation is received. Until that time, engaging in any additional evaluation of this award would amount to little more than a "judicial snipe-hunt." Federated Dep't Stores, Inc. v. J.V.B. Indus., Inc., 894 F.2d 862, 871 (6th Cir. 1990) (J. Martin, concurring). The Court declines to further pursue that endeavor.

## CONCLUSION

For the reasons set forth above, this matter will be remanded to the panel of arbitrators who rendered the decision for clarification of the damages awarded.


It is so ORDERED.

/s/    _Rep_
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: August 31, 2017